**Jane DOE, John Doe, Baby Jane Doe, by her guardian, John Doe, Baby John Doe, by his guardian, John Doe, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 1:01CV00646.**

United States District Court,
M.D. North Carolina.

Aug. 27, 2003.

Robinson O. Everett, Craig Myer Kabatchnick, Seth Allen Neyhart, Everett & Everett, Durham, NC, for Plaintiffs.

Gill P. Beck, Office of U.S. Attorney, Greensboro, NC, for Defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiffs Jane Doe, John Doe, Baby Jane Doe, and Baby John Doe filed this action against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), *et seq.* Plaintiffs claim that members and civilian personnel of the United States Navy administered a blood transfusion to Jane Doe in 1983 negligently and without her informed consent. After a bench trial, the court issues the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Pregnant with her first child, Plaintiff Jane Doe arrived at the Navy Regional Medical Center in Millington, Tennessee ("NRMC Millington"), in the evening of July 7, 1983. She was 20 years old, receiving medical care as a dependent of her Marine husband, Plaintiff John Doe. It was not her first visit to NRMC Millington.

Just eight days before, doctors at the facility tried to induce labor because she had carried her child 15 days beyond her due date. The inducement did not result in childbirth. Now she was three weeks past term, her amniotic fluid had been leaking for 20 hours, and she was in labor.

After an initial examination, Dr. Harold Short, a family physician, recognized that it was important for Jane Doe's labor to progress. Her ruptured membranes, which permitted amniotic fluid to leak, had caused an infection of the uterus evidenced by a low-grade fever. In addition, she had high blood pressure and an elevated heart rate. Dr. Short placed Jane Doe on antibiotics for the infection and oxytocin, a hormone that stimulates the uterus to contract, to induce childbirth. Recognizing that a Caesarean section was a possibility, he ordered that two units of red blood cells should be typed and cross-matched so Jane Doe could be transfused if necessary. Dr. Short consulted Dr. Romeo Perez, an obstetrician, who concurred with the course of treatment.

By 5:30 a.m., on July 8, Jane Doe's labor had stalled despite continued doses of oxytocin. Dr. Short noted the presence of thick meconium, material from the baby's bowel that is typically passed after birth. More alarmingly, the fetal heart monitor showed the baby's heart rate declining after each contraction. Together with the meconium, these "late decelerations" indicated fetal distress. Dr. Perez and Dr. Short decided to perform an emergency Caesarean section.

With Dr. Perez en route to the hospital, Dr. Short obtained Jane Doe's consent for the surgery, explaining that further induction posed high risks to the baby's health. Consistent with his standard practice at the time, he identified risks associated with a Caesarean section, including infection, injury to the baby, and risks associated with anesthesia. He discussed the risk of excessive bleeding, including the danger of bleeding so severe that would necessitate a transfusion, which itself carried the risk of a negative reaction. Jane Doe responded that she understood these risks and opted for general anesthesia rather than an epidural anesthetic. Jane Doe signed Standard Form 522 to consent to the procedure in the presence of Dr. Short and a nurse, who also signed the form.

Dr. Perez arrived at the hospital and met Jane Doe for the first time. In keeping with his standard practice, he introduced himself, explained his role as a specialist in obstetrics, and discussed why he believed a Caesarean section was appropriate. He identified alternatives to surgery, such as waiting, and their consequences. Like Dr. Short, Dr. Perez told Jane Doe that excessive bleeding during the procedure could make a blood transfusion necessary. He went on to explain that receiving a transfusion brought risks of hepatitis and negative reactions to the transfused blood. He concluded by giving Jane Doe the opportunity to ask questions. Jane Doe does not remember anyone mentioning the possibility of a transfusion before her surgery, nor does she remember any consultation with Dr. Short or Dr. Perez.

At 7:02 a.m., on July 8, Baby Jane Doe was born by Caesarean section. After the surgery, Jane Doe continued to receive oxytocin to control bleeding in the uterus. She had lost 450 to 800 cubic centimeters ("cc") of blood during the operation, and by 9:00 a.m. she had saturated three perineum pads with blood. Dr. Perez ordered a complete blood count to be performed six hours after the surgery and another one for the following morning. During the day of July 8, Jane Doe appeared to be recovering well. Her uterus was firm, her postpartum bleeding was moderate, and she visited the nursery in a wheelchair.

The blood count results showed that Jane Doe had experienced significant blood loss. The two most direct measures were her levels of hemoglobin and hematocrit; the former is the part of red blood cells which carry oxygen, and the latter is the ratio of red blood cells to total blood volume, expressed as a percentage. Jane Doe's hemoglobin count had fallen from 12.8 grams per 100 milliliters of blood at admission, to 10.1 in the afternoon of July 8, to 8.9 on the morning of July 9. Her hematocrit had fallen from 35.5 at admission to 29.1 on July 8 to 25.6 on the morning of July 9. By 3:00 p.m., on July 9, when Dr. Perez learned the results of that morning's tests, Jane Doe's heart rate had risen from 96 beats per minute when she was admitted to 116 beats per minute, indicating that her heart was working harder to supply oxygen to her body. Her temperature was 100 degrees. By 3:30 p.m., Jane Doe passed what she recalls as one blood clot. The medical record explicitly describes several "large" clots, each understood by obstetricians to mean the size of a fist. At 4:00 p.m., a nurse called Dr. Perez to inform him about the clots, which suggested further loss of blood.

Based on this information, but without going to Jane Doe's bedside for a clinical evaluation or additional consent, Dr. Perez ordered a transfusion of two units of packed red blood cells. The blood came from a blood bank operated by the Navy, and everyone involved in collecting and transfusing the blood was a federal employee or agent. After the transfusion, Jane Doe's vital signs improved; her hemoglobin, for example, increased to 10.7, a two-point rise consistent with the administration of two units of red blood cells. She went home three days later, on July 12.

Three years later, in 1986, Jane Doe gave birth to her second child, Baby John Doe. She nursed both children.

Starting in 1991, Jane Doe developed myriad health problems. She endured swollen glands, gall bladder problems, sore throat with fevers of unknown origin, unexplained rashes, thrush, and shingles, among other ailments. In June 1995, her hair started falling out. In July, she was diagnosed with a severe yeast infection of her esophagus, a condition typically found only in terminally ill patients.

On July 18, 1995, Jane Doe tested positive for HIV. The test was performed by Dr. Terry Daniel, Jane Doe's family physician. Dr. Daniel explained to Jane Doe that although another test would be necessary to verify the diagnosis, the preliminary results meant she probably had Acquired Immune Deficiency Syndrome ("AIDS"). On July 24, 1995, Jane Doe learned that subsequent testing had confirmed the diagnosis. Not only did she test positive for HIV antibodies, but her extremely low CD-4 lymphocyte count suggested that her condition was very advanced. On July 31, 1995, Jane Doe learned that she had full-blown AIDS. Dr. Timothy Lane, an infectious disease specialist, took over her medical care.

Jane Doe and her doctors immediately began searching for the cause of her infection. On July 31, 1995, the day she received the conclusive diagnosis, Jane Doe and her husband completed an adult HIV Confidential Case Report. The report shortened the list of possible risk factors to two: "sex with male" and "transfusion of blood/blood components." (Gov't Ex. B–21.) Jane Doe had no sexual partners other than her husband. She initially suspected an affair by her husband, three years earlier, as the source of her HIV infection. John Doe, however, had twice tested negative for HIV.

A blood transfusion remained the other potential cause of infection. On the HIV Confidential Case Report, Jane Doe listed

two occasions when she had received blood transfusions: the Caesarean birth of Baby Jane Doe at NRMC Millington in 1983, and her delivery of Baby John Doe in 1986. Because blood donations have been screened for HIV antibodies since 1985, Dr. Daniel considered the 1983 transfusion the probable cause of Jane Doe's infection.[1] When Mr. and Mrs. Doe took their children to Dr. Wilma Lim for HIV testing on August 31, 1995, they told her that Jane Doe had contracted AIDS from a blood transfusion in 1983.

After seeing Jane Doe twice in August and September 1995, Dr. Lane noted in the medical record his intention to trace the 1983 blood transfusion. Jane Doe authorized this "look back" to identify the donors of the transferred blood, and Dr. Lane telephoned NRMC Millington on October 27, 1995.[2] He followed up with a written request on October 31 for records concerning the transfusion and an investigation into the donors' HIV status. The Navy's response to the request arrived on October 4, 1996, nearly a year later, in the form of a faxed copy of an internal memorandum from the Navy's Bureau of Medicine and Surgery to the commanding officer of NRMC Millington. Blood donor number M466896, who contributed one of the units of blood administered to Jane Doe, had died of AIDS.[3] The duration of the look back fell within the typical range for the Navy Blood Program.

On September 2, 1998, Plaintiffs' counsel filed administrative claims with the Navy,[4] which denied the claims on statute of limitations grounds on May 18, 2001. The Doe family filed the present action on July 3, 2001.

## II. DISCUSSION

This case arises from the blood transfusion administered in July 1983, in the early stages of the medical profession's encounter with AIDS. In June 1983, military blood donors were asked to voluntarily refrain from donating blood if they fell into particular social groups, including sexually active homosexuals and intravenous drugs users, viewed as more likely to contract AIDS. At that time, "it was only hypothesized that AIDS was a blood borne virus." *Doe v. Miles Lab., Inc.*, 927 F.2d 187, 189 (4th Cir.1991). "It is now widely accepted" that "the medical and scientific communities did not reach a consensus that AIDS could be transmitted by blood until 1984," the year scientists identified the virus that causes the disease. *Spence v. Miles Lab., Inc.*, 37 F.3d 1185, 1187 (6th Cir.1994). That same year, of 1984, dis-

---

1. Contrary to her notation on the Confidential Case Report, Jane Doe had not been transfused in 1986.

2. The Navy implemented the Look Back Program to trace the disposition of blood donations by donors who subsequently tested positive for HIV.

3. Blood donor number M466896 deserted the Navy in April 1985. In April 1986, civil authorities in San Francisco apprehended and turned him over to military police, who detained him in the Treasure Island, California brig. At a special court martial, he was found guilty of desertion and received a sentence that included confinement for 60 months and a bad conduct discharge. He underwent a separation physical examination in May and was released into the private sector on June 2, 1986. His physical did not include an HIV test because the Navy's phased-in testing program did not yet require one.

4. Shortly after learning that one of Jane Doe's donors had died of AIDS, Plaintiffs retained counsel. In late August 1998, nearly two years after the date of the Navy's look-back response, the lawyer passed Plaintiffs' case to their present counsel. Jane Doe's present counsel acted promptly and professionally in recognizing the need to file the administrative claims so quickly. Present counsel are to be commended for their efforts.

cussions of AIDS risk became part of standard obstetric practice in Tennessee. The first test to screen blood for HIV antibodies was not licensed until March 1985. *Doe*, 927 F.2d at 190.

After the court's summary judgment ruling, the case went to trial on the Government's statute of limitations defense and on Plaintiffs' claims of medical malpractice and lack of consent.[5] The court addresses each issue in turn.

## A. Statute of Limitations

■ The Government contends that the FTCA's two-year statute of limitations bars Plaintiffs' claims. *See* 28 U.S.C. § 2401(b). Although state law determines whether a cause of action exists under the FTCA, federal law governs when that cause of action accrues. *Gould v. Department of Health and Human Servs.*, 905 F.2d 738, 742 (4th Cir.1990) (*en banc*). A tort claim against the United States is barred unless it is presented "in writing to the appropriate federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b); *United States v. Kubrick*, 444 U.S. 111, 113, 100 S.Ct. 352, 354–55, 62 L.Ed.2d 259 (1979). The FTCA constitutes a limited waiver of sovereign immunity, *id.* at 117–18, 100 S.Ct. at 357, and satisfying the two-year statute of limitations is a "key jurisdictional prerequisite" to suit that cannot be waived. *Kokotis v. United States Postal Serv.*, 223 F.3d 275, 278 (4th Cir.2000).

■ FTCA claims typically accrue when the plaintiff is injured. *Kubrick*, 444 U.S. at 120, 100 S.Ct. at 358. In medical mal-

practice cases, however, neither the plaintiff's injury nor its cause may be immediately apparent. *Id.* at 122, 100 S.Ct. at 359. According to the "discovery rule" applied in such cases, a plaintiff's claim accrues "when the plaintiff knows or, in the exercise of due diligence, should have known both the existence and the cause of his injury." *Gould*, 905 F.2d at 742. A plaintiff possesses this knowledge when he becomes aware of "the critical facts that he has been hurt and who has inflicted the injury." *Kubrick*, 444 U.S. at 122, 100 S.Ct. at 359. A plaintiff armed with these critical facts must investigate to determine if the injury resulted from negligent conduct. *Id.* at 123–24 & n. 10, 100 S.Ct. at 360 & n. 10. Thus, a medical malpractice claim accrues under the FTCA "when a claimant first knows of an injury and its cause, and not only later when it is first realized that a particular legal claim may be maintainable in consequence of the injury." *Miller v. United States*, 932 F.2d 301, 304 (4th Cir.1991). This standard requires that a plaintiff have only "elemental knowledge" of his claim, not that he possess "complete knowledge of all elements or a legal understanding of the nature of the claim." *Lekas v. United Airlines, Inc.*, 282 F.3d 296, 299 (4th Cir.2002). In short, the cause of action accrues upon inquiry notice. *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir.1995) (*en banc*).

■ For Plaintiffs' FTCA claims to be viable, they must have accrued after September 2, 1996, because Plaintiffs filed an

5. Both parties moved for summary judgment on the statute of limitations issue. The court determined that the record, viewed in the light most favorable to the respective non-moving party, presented a genuine issue of material fact as to when Jane Doe knew or should have known that the transfusion caused her HIV infection. At the summary

judgment hearing, Plaintiffs conceded that the FTCA's discretionary function exception barred their claims that the Navy negligently administered its blood bank and Look Back programs. Neither party moved for summary judgment on the merits of Plaintiffs' medical battery, informed consent, or medical malpractice claims.

administrative action with the Navy on September 2, 1998. *See* 28 U.S.C. § 2401(b). Plaintiffs received inquiry notice on one of several possible dates. On July 31, 1995, Plaintiffs learned conclusively that Jane Doe had AIDS and examined her risk factors with Dr. Daniel. On August 31, 1995, Jane Doe told Dr. Lim that she believed the 1983 blood transfusion had caused her HIV infection. On September 21, 1995, Dr. Lane placed the 1983 transfusion at the top of his list of potential causes. On October 27, 1995, Dr. Lane made a telephone inquiry about the 1983 transfusion. On October 31, 1995, he submitted to the Navy a formal request for information. The memorandum conveying the news that one of Jane Doe's blood donors had died of AIDS was dated September 3, 1996. Dr. Lane received this information on October 4, 1996.

Defendant argues that Plaintiffs were on inquiry notice on the earliest of the possible dates, July 31, 1995. On that day, Plaintiffs knew that Jane Doe had AIDS; that her only risk factors were "sex with male" and blood transfusions; that she had received a blood transfusion at NRMC Millington in 1983, before donated blood was screened for HIV; that the other suspected transfusion occurred in 1986, after blood banks screened donated blood for HIV; that her only sexual partner was her husband, John Doe; that John Doe had twice tested negative for HIV; and that Dr. Daniel, Jane Doe's family physician, believed the 1983 transfusion was the probable cause of her HIV infection. Thus, Plaintiffs possessed on July 31, 1995 the "critical facts" that Jane Doe had AIDS and that the 1983 blood transfusion had caused her injury.

Plaintiffs contend that they were on inquiry notice on the last of the possible dates, October 4, 1996, when Dr. Lane received the fax stating that one of Jane Doe's blood donors had died of AIDS. Before that time, they argue, they could not know the critical fact about the cause of Jane Doe's HIV infection because that information remained in the Government's hands, unavailable despite her reasonable diligence.

The Fourth Circuit has rejected this argument. In *Kerstetter v. United States,* 57 F.3d 362 (4th Cir.1995), the court explained:

> [I]t should not make a difference when the plaintiff learns just what went wrong during a medical operation. So long as the plaintiff knows the "critical fact" of "who has inflicted the injury," he can act to protect his rights by inquiring whether the injury was inflicted negligently. If he comes to suspect that it was, then he can file suit even before he discovers the precise medical cause of the operation's failure. After all, it might not be until discovery that he gains a satisfactory appreciation of the immediate cause of his injury.

*Kerstetter,* 57 F.3d at 365. The Fourth Circuit explicitly rejected the Kerstetter plaintiffs' suggestion that they knew the cause of their daughter's kidney failure only when they learned "the *precise medical reason* for the injury." *Id.* at 364. The "correct" construction of the term "cause" demanded "a greater level of generality—one that would require, in this case, only knowledge that the *operation* caused the injury." *Id.*

Before receiving any information from the Navy, Jane Doe and those treating her had eliminated all risk factors except for the transfusion and her husband, who was HIV-negative. Dr. Daniel identified the transfusion as the probable cause of her infection in July 1995. Jane Doe acknowledged to Dr. Lim in August 1995 that the transfusion caused her infection. Dr. Lane considered the transfusion to be the

prime suspect in September 1995. Jane Doe authorized Dr. Lane to submit an inquiry, the essence of inquiry notice, in October 1995. The Supreme Court and the Fourth Circuit have found claim accrual with less definitive notice of causation. *See, e.g., Kubrick,* 444 U.S. at 122, 100 S.Ct. at 359 (holding that the plaintiff's claim accrued when a physician told him that it was "highly possible" that his hearing loss resulted from a medical procedure); *Townley v. Norfolk & W. Ry. Co.,* 887 F.2d 498, 500 (4th Cir.1989) (concluding that the plaintiff's claim accrued when he "suspected that he suffered from black lung disease and that his condition was caused by his work on the railroad"). Following this authority, the court concludes that the Navy's look-back response provided Plaintiffs merely the "precise medical reason" for Jane Doe's HIV infection, not one of the critical facts necessary for claim accrual. *Kerstetter,* 57 F.3d at 364.

Despite the compassion that Jane Doe's plight inspires, the court concludes that Plaintiffs' claims accrued on July 31, 1995. On that date, Jane Doe knew that her only risk factors were "sex with male" and blood transfusion, and that her husband had twice tested negative for HIV. She also knew that the 1983 transfusion occurred before blood was tested for HIV. Her family physician, Dr. Daniel, testified that Jane Doe's 1983 transfusion was her only HIV risk factor on July 31, 1995, once her husband had tested negative for HIV. Dr. Daniel considered the transfusion the probable cause of her infection. As a measure of the transfusion's importance in the minds of Jane and John Doe, they told Dr. Lim in August 1995 that the transfusion had caused Jane Doe's HIV infection.

■ Plaintiffs may not have been certain that the transfusion was the cause, but lingering uncertainty does not prevent claim accrual. *Kerstetter,* 57 F.3d at 364.

In addition, the existence of more than one potential cause does not delay claim accrual. *Nemmers v. U.S.,* 795 F.2d 628, 631 (7th Cir.1986) ("The putative plaintiff need not know that the suspicious event is more likely than not the cause."). Jane Doe continued to suspect her husband as the source of her infection, but Dr. Daniel eliminated him as the cause after he twice tested negative for HIV. Under the FTCA's objective standard, Jane Doe knew or should have known in July 1995 that the transfusion had caused her HIV infection. *See Gould,* 905 F.2d at 742; *Nemmers,* 795 F.2d at 631. Plaintiffs' administrative claims should have been filed before July 31, 1997. Their submission on September 2, 1998 was too late.

Jane Doe testified that she was in shock after her diagnosis, and that her immediate focus was on survival, not on gathering information for a prospective lawsuit. This natural reaction cannot be dismissed as unreasonable. Even considering Jane Doe's condition, however, she clearly was on inquiry notice no later than October 31, 1995 when Dr. Lane initiated a formal inquiry about the transfusion. The statute of limitations set forth in 28 U.S.C. § 2401(b) "represents a deliberate balance struck by Congress whereby a limited waiver of sovereign immunity is conditioned upon the prompt presentation of tort claims against the government." *Gould,* 905 F.2d at 742. Even when faced with powerful equitable considerations, courts are not free to construe the statute "so as to defeat its obvious purpose, which is to encourage the prompt presentation of claims." *Kubrick,* 444 U.S. at 117, 100 S.Ct. at 357.

Jane Doe had family support, and her understandable shock and denial did not last two years. Several witnesses testified that she was interested in what caused her predicament. She identified the 1983

transfusion to Dr. Lim as the cause of her infection in August 1995. She authorized Dr. Lane to request a look back in October 1995. When the Navy's response in October 1996 confirmed that one of her blood donors had died of AIDS, she was devastated. In February 1997, however, with help from her husband, she sought legal representation. All of this activity took place within the two-year limitations period, which elapsed in July 1997. Plaintiffs did not file a claim until September 1998. Regardless of the reason for this delay, the Government cannot be made to bear the burden of these consequences. *Kubrick,* 444 U.S. at 124, 100 S.Ct. at 360 ("If [a plaintiff] fails to bring suit because he is incompetently or mistakenly told that he does not have a case, we discern no sound reason for visiting the consequences of such error on the defendant by delaying the accrual of the claim until the plaintiff is otherwise informed.").

■ Plaintiffs argue that the Government's exclusive possession of donor information delayed claim accrual until Dr. Lane received the Navy's response to his inquiry about the 1983 transfusion. The Navy did control some information about Jane Doe's transfusion, including the facts that the blood came from the military and that one of the donors had died of AIDS. As explained above, however, the absence of this information did not delay claim accrual. *See Gould,* 905 F.2d at 745 (holding that claim accrual under the FTCA "does not wait until a plaintiff is aware

that an alleged tort-feasor is a federal employee"). Plaintiffs express justifiable frustration at the manner in which the Navy responded to their request for information. They do not, however, allege misconduct that would support equitable tolling of the statute of limitations,[6] and no evidence suggested wrongdoing or undue delay by the Navy.

Although the court recognizes the hardship resulting to Plaintiffs in this case, it has no choice but to apply the law as written. *Id.* at 747; *see also Mann v. United States,* 399 F.2d 672, 673 (9th Cir. 1968) ("Although exceptions to the applicability of the limitations period might occasionally be desirable, we are not free to enlarge that consent to be sued which the Government, through Congress, has undertaken so carefully to limit."). The FTCA's statute of limitations "is jurisdictional and nonwaivable," and a claim accrues when the plaintiff knew or should have known of the injury and its cause. *Gould,* 905 F.2d at 740. Plaintiffs knew on July 31, 1995 that Jane Doe had AIDS and that the 1983 transfusion was a likely cause of her infection. Jane Doe told a doctor one month later that the transfusion had caused the infection. In October 1995 she displayed definitive evidence of inquiry notice by authorizing a formal inquiry to the Navy. Plaintiffs did not file a claim until September 2, 1998, well after the limitations period expired. Therefore, their claims are barred by the statute of limitations.[7]

---

**6.** Statutes of limitations may be equitably tolled when "the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." *See Kokotis v. United States Postal Serv.,* 223 F.3d 275, 280–81 (4th Cir.2000) (quoting *English v. Pabst Brewing Co.,* 828 F.2d 1047, 1049 (4th Cir.1987)). For FTCA purposes, equitable tolling addresses active deception, *Lekas v. United Airlines, Inc.,* 282 F.3d 296,

301 (4th Cir.2002), and plaintiffs do not accuse the government of such conduct.

**7.** Because the statute of limitations bars Jane Doe's claims, it also bars the claims of the other Plaintiffs. *See McCall v. United States,* 310 F.3d 984, 988 (7th Cir.2002); *MacMillan v. United States,* 46 F.3d 377, 381 (5th Cir. 1995); *Zavala v. United States,* 876 F.2d 780,

### B. Medical Malpractice

■ Even if Plaintiffs could survive the statute of limitations defense, they would still face the challenge of proving liability for events that occurred two decades ago. Claims filed under the FTCA are construed using the substantive law of the state in which the alleged tort occurred. 28 U.S.C. §§ 1346(b), 2674. Therefore, Tennessee law applies in this case.

Plaintiffs' first claim alleges that Dr. Perez committed medical malpractice when he ordered the transfusion on July 9, 1983. A medical malpractice plaintiff suing under Tennessee law must prove:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn.Code Ann. § 29–26–115(a). A doctor has a duty to exercise reasonable care and diligence, and he must exercise his best judgment regarding treatment. *Ward v. United States*, 838 F.2d 182, 186 (6th Cir. 1988). Liability for malpractice depends on whether the physician fails to exercise the reasonable degree of learning, skill,

and experience that is ordinarily possessed by others of his profession. *Jackson v. United States*, 24 F.Supp.2d 823, 832 (W.D.Tenn.1998) (citing *Ward*, 838 F.2d at 186–187).

Dr. Perez ordered the blood transfusion at 4:00 p.m. on July 9. He knew that Jane Doe had lost 450 to 800 cc of blood during surgery the previous morning; that her hemoglobin count had fallen from 12.8 grams per 100 milliliters of blood on July 7, to 10.1 on July 8, to 8.9 on the morning of July 9; that her hematocrit had fallen from 35.5 to 25.6 during the same period; that her heart rate, which had been consistently elevated since the surgery, had risen to 116 beats per minute; that her temperature was 100 degrees; and that she had passed blood clots earlier that afternoon, indicating further loss of blood. Based on this information, he ordered the transfusion of two units of packed red blood cells.

■■ Under Tennessee law, a physician does not commit malpractice if he chooses a course of treatment supported by other competent physicians. *Truan v. Smith*, 578 S.W.2d 73, 76 (Tenn.1979). Similarly, because physicians enjoy the latitude of professional judgment, they do not breach the standard of care simply by choosing a procedure that is "but one of several procedures recognized in the profession as adequate" to treat a patient's condition. *Harris v. Buckspan*, 984 S.W.2d 944, 952–53 (Tenn.Ct.App.1998).

■ Dr. John Van Hooydonk and Dr. Lewis Nelson, both experienced obstetricians,[8] testified that Dr. Perez's decision to transfuse Jane Doe was an appropriate

---

782 (9th Cir.1989); *Tuggle v. Allright Parking Sys., Inc.*, 922 S.W.2d 105, 109 (Tenn.1996).

**8.** Dr. Van Hooydonk has held an assistant professorship in obstetrics and gynecology, in addition to other titles, at the Vanderbilt University School of Medicine since 1979. Dr. Nelson has been a member of the faculty of the Wake Forest University School of Medicine since 1976. He currently holds positions as Acting Chief of the Department of Obstetrics and Gynecology and as an assistant dean in the School of Medicine.

course of treatment, and that the care she received exceeded the standard of obstetrical care in Tennessee in 1983. At that time, physicians relied on guidelines that strongly indicated a transfusion if testing showed a hemoglobin level below 10 or a hematocrit below 30. Jane Doe's readings were 8.9 and 25.6, respectively, and she subsequently passed blood clots suggesting further loss of blood. Dr. Nelson testified that an obstetrician monitoring a post-operative patient under these circumstances may reasonably rely on information from laboratory reports, the observations of an experienced nurse, and his own clinical evaluation from morning rounds to order a transfusion. Dr. Perez's decision not to perform a physical examination before ordering the transfusion was within this standard of care. Similarly, his decision not to draft a separate note detailing his reasons for the transfusion also conformed to the standard of care in 1983, when doctors considered blood transfusion a low-risk procedure.

Dr. Richard Van Fletcher, Plaintiffs' expert, opined that Dr. Perez should have visited Jane Doe before ordering the transfusion and should have stated explicitly his reasons for transfusing her in his notes. Dr. Fletcher noted that Jane Doe had normal kidney function, was not dizzy, had no significant drop in blood pressure, and had a heart rate not dramatically different from measures taken throughout her hospitalization. Taken together, Dr. Fletcher observed that these symptoms were inconsistent with shock, the danger that the transfusion purported to avert. He did not testify directly that the decision to transfuse Jane Doe violated the stan-

dard of care for making such decisions; to the contrary, he admitted that some physicians in 1983 would have ordered a transfusion for a patient with a hemoglobin count of 8.9. Instead, Dr. Fletcher stated that the cold clinical record did not support Dr. Perez's decision to transfuse Jane Doe, and that the absence of a explicit rationale for the transfusion in the record violated the standard of care.

For Plaintiffs to recover based on medical malpractice, it is not enough to show that Dr. Perez should have kept better records. Rather, they must prove that Dr. Perez's order to transfuse Jane Doe violated the standard of care in Millington, Tennessee and similar communities in 1983. *See* Tenn.Code Ann. § 29–26–115(a); *Jackson,* 24 F.Supp.2d at 832 ("In determining the degree of learning and skill required of a medical practitioner in the treatment of a particular case, regard must be given to the state of medical science at the time."). Although Dr. Fletcher disagrees with Dr. Perez's transfusion order, "a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken." *McPeak v. Vanderbilt Univ. Hosp.,* 33 Tenn.App. 76, 229 S.W.2d 150, 152 (1950).[9] No evidence suggests that Dr. Perez did not exercise his best judgment in ordering a transfusion based on the available information. Dr. Perez had evaluated Jane Doe clinically on the morning of July 9, and information from nurses and laboratory tests supported his conclusion that a transfusion was justified to ward off the reasonable risk of shock. Dr. Van Hooydonk and Dr. Nelson testified

---

**9.** Although Tennessee's medical malpractice statute did not take effect until 1975, Tennessee courts applying the statute give precedential effect to cases decided before that date. *Ward v. United States,* 838 F.2d 182, 184 n. 2 (6th Cir.1988) (citing *German v.*

*Nichopoulos,* 577 S.W.2d 197 (Tenn.Ct.App. 1978)); *see also Cardwell v. Bechtol,* 724 S.W.2d 739, 753 (Tenn.1987) (stating that Tenn.Code. Ann. § 29–26–115 codifies the common law elements of negligence).

that this course of treatment exceeded the standard of care in 1983.

To the extent that Dr. Fletcher opined that the decision to transfuse Jane Doe violated the standard of care, the court cannot attribute greater weight to that evidence than the statements of Dr. Hooydonk and Dr. Nelson for two reasons. First, although Dr. Fletcher graduated from medical school in Tennessee in 1974, he has never practiced obstetrics there. Dr. Van Hooydonk has practiced in Tennessee since completing his residency at Vanderbilt in 1976. Dr. Nelson taught obstetrics at the University of Tennessee in 1979–1980. Second, Dr. Nelson and Dr. Hooydonk have greater breadth of experience born both of their teaching responsibilities and their ongoing obstetrics practices. Dr. Fletcher stopped practicing in 1990.

Plaintiffs failed to prove by a preponderance of the evidence that the decision to transfuse Jane Doe violated the standard of care. Therefore, the court will enter a judgment for the Government on the medical malpractice claim.

### C. Lack of Consent

■ Plaintiffs' remaining claims allege that Jane Doe did not consent to the transfusion. Tennessee provides two ways to recover for lack of consent: (1) medical battery, for completely unauthorized procedures, and (2) lack of informed consent, a variety of medical malpractice, for failure to disclose risks inherent in authorized procedures. *Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn.1998). Plaintiffs proceed under both theories.

To prevail on her medical battery claim, Jane Doe must show that she was unaware that she would be transfused, and that she did not authorize the transfusion. *Blanchard*, 975 S.W.2d at 524. Jane Doe remembered receiving the transfusions, which

took several hours to complete. Dr. Short discussed the possibility of transfusion before Jane Doe signed Standard Form 522, which signified that she understood the risks of Caesarean section, including transfusion. Dr. Perez also told Jane Doe before surgery of the risk that a transfusion could be necessary.

Plaintiffs argue that Jane Doe's consent to a Caesarean section on July 8 did not encompass consent to a transfusion administered the following day. According to the standard of care in Tennessee in 1983, however, consent to the surgery constituted consent to reasonable post-operative care, including transfusions. Dr. Van Hooydonk, whose practice at a Nashville hospital made him familiar with consent forms from across the state, testified that the Standard Form 522 was representative of pre-operative consent forms in 1983. According to Dr. Van Hooydonk, obstetricians in Tennessee in 1983 did not use a separate consent form before ordering a post-operative transfusion, which was viewed as a low-risk procedure. Dr. Perez also testified that it was not customary to execute a second consent form once a patient gave informed consent to surgery. Plaintiffs offered no evidence to the contrary. Therefore, the court concludes that Jane Doe consented to the transfusion. Because Jane Doe was aware of the transfusions and authorized them by her consent to the surgery, the court will enter judgment for Defendant on the medical battery claim.

To prevail on the claim that Jane Doe's consent was not informed consent, Plaintiffs bear the burden of marshaling expert testimony to establish: (1) what a reasonable medical practitioner in the same or similar community would have disclosed to the patient about the risk posed by the proposed treatment, and (2) that the defendant departed from the norm. *Ashe v.*

*Radiation Oncology Assoc.,* 9 S.W.3d 119, 121 (Tenn.1999); *German v. Nichopoulos,* 577 S.W.2d 197, 204 (Tenn.Ct.App.1978). Plaintiffs also must prove that a reasonable person in Jane Doe's position would not have consented to the transfusion if adequately informed of all significant perils. *Ashe,* 9 S.W.3d at 120. To determine the adequacy of the information provided, the court considers the nature of the procedure, the extent of the risks involved, and the applicable standard of care. *Blanchard,* 975 S.W.2d at 525. Regarding the standard of care and its breach, Plaintiffs must demonstrate that:

> the defendant did not supply appropriate information to the patient in obtaining informed consent to the procedure ... in accordance with the recognized standard of acceptable professional practice in the profession and in the specialty, if any, that the defendant practices in the community in which the defendant practices or in similar communities.

Tenn.Code. Ann. § 29–26–118.

Standard practice in Millington, Tennessee in 1983 called for disclosure of the fact that transfusion recipients could experience a transfusion reaction, including a fever and rash. Other risks were considered very rare, and informed consent for a transfusion commonly occurred after a brief discussion, commensurate with its status as a low-risk procedure. The standard of care did not require doctors to discuss the risk of infection, for example, because blood banks screened for known blood-borne infectious diseases such as malaria, syphilis, and hepatitis.[10] Every obstetrician, including Plaintiffs' expert, Dr. Fletcher, testified that the standard of care in 1983 did not require informing patients about the risk of HIV from a

blood transfusion. A patient's consent to be transfused, granted before surgery, extended to that patient's post-operative treatment.

The evidence shows that Dr. Short and Dr. Perez discussed the known material risks of a transfusion with Jane Doe before her surgery. Dr. Short disclosed to Jane Doe the possibility that she would have an unusual reaction to the transfused blood. Dr. Perez told Jane Doe about the risk of febrile reactions and hepatitis associated with blood transfusions.

Plaintiffs allege that Dr. Perez and Dr. Short failed to disclose the risks identified on a list attached to a version of Standard Form 522 created four years after Jane Doe's transfusion. Dr. Nelson and Dr. Van Hooydonk testified, however, that several of those risks are so rare that doctors in Tennessee did not disclose them to patients in 1983, when physicians were less wary of transfusions. Dr. Van Hooydonk and Dr. Nelson both testified that the discussion of potential risks by Dr. Short and Dr. Perez, including the risks associated with transfusion, exceeded the standard of care for informed consent in 1983.

█ A doctor may obtain informed consent before a surgery without disclosing "every possible thing that might go wrong." *Longmire v. Hoey,* 512 S.W.2d 307, 310 (Tenn.Ct.App.1974). Plaintiffs failed to prove that Jane Doe's physicians departed from the standard of care for disclosing the risks of transfusion. They also failed to convince the court that a reasonable person would have refused consent to a transfusion just before submitting to surgery under a general anesthetic. Therefore, judgment for Defendant is ap-

---

**10.** Dr. Short did, however, inform Jane Doe that her overall treatment presented a risk of infection.

propriate on Plaintiffs' informed consent claim.

## III.   CONCLUSION

"We refer from time to time to a case as a hard one.   We may mean that it is close and difficult to decide.   Or we may mean, as we do here, that, while it is not so close, it is nevertheless difficult to decide because of its harsh impact on one of the parties." *Wilkinson v. United States,* 677 F.2d 998, 998 (4th Cir.1982).   The tragedy that has befallen Jane Doe has brought suffering and anguish to her and her family.   The court extends to them its compassion and encouragement.   The law and the evidence dictate, however, that the Government is not liable for her injury.   Plaintiffs did not file their claims within the two-year limitations period, and they did not prove that Jane Doe's doctors failed to comply with the applicable standards of care.   Accordingly, the court must enter a verdict for the Defendant.

## IV.   CONCLUSIONS OF LAW

1.   The court has jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*

2.   Venue in this district is proper.   28 U.S.C. § 1402(b).

3.   Plaintiffs' claims accrued on July 31, 1995, and they failed to file an FTCA claim until September 1998.   Plaintiffs proved no misleading conduct warranting equitable tolling of the statute of limitations. Accordingly, the FTCA's two-year statute of limitations bars Plaintiffs' claims.   *See* 28 U.S.C. § 2401(b).

4.   Even if the statute of limitations had not barred Plaintiffs' claims, Plaintiffs failed to prove by a preponderance of the evidence that Dr. Perez violated the applicable standard of care in ordering a transfusion for Jane Doe.

5.   Even if the statute of limitations had not barred Plaintiffs' claims, Plaintiffs failed to prove by a preponderance of the evidence that Jane Doe gave no consent to be transfused at NRMC Millington following her Caesarean section.

6.   Even if the statute of limitations had not barred Plaintiffs' claims, Plaintiffs failed to prove by a preponderance of the evidence that Jane Doe's consent to the transfusions was not informed.